```
UNITED STATES DISTRICT COURT                   FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
                                               :
ANTHONY M. AUGUSTA,                            :
                                               :
                               Plaintiff,      :
                                               :            MEMORANDUM
              - against -                      :            AND ORDER
                                               :
COMMUNITY DEVELOPMENT                          :            07-CV-0361 (JG) (ARL)
CORPORATION OF LONG ISLAND, INC.,              :
                                               :
                               Defendant.      :
---------------------------------------------------------------- X
```

A P P E A R A N C E S :

    ANTHONY M. AUGUSTA
        2 Boulevard Ave., Apt. 1
        Greenlawn, NY 11740
        Plaintiff, *pro se*

    FUMUSO, KELLY, DEVERNA, SNYDER,
    SWART & FERRELL, LLP
        110 Marcus Blvd.
        Hauppauge, NY 11788
    By:    Albert E. Risebrow
        Scott G. Christesen
        Attorneys for Defendant

JOHN GLEESON, United States District Judge:

        Anthony M. Augusta, a participant in the federally-subsidized Section 8 Housing Choice Voucher ("HCV") Program, filed the *pro se* complaint in this case against defendant Community Development Corporation of Long Island, Inc., ("CDCLI"), a local administrator of the program. Augusta alleges that he was denied the due process of law guaranteed by the Fourteenth Amendment when his Section 8 housing voucher was terminated without a hearing in January 2005. Compl. ¶ 4. The parties cross-move for summary judgment pursuant to Fed. R. Civ. P. 56. Oral argument on the motions was held on December 5, 2008.

For the reasons stated below, I grant defendant's motion for summary judgment and deny the plaintiff's.

BACKGROUND

The facts in this case, viewed in the light most favorable to Augusta, are as follows.[1]

A.  *Overview of the Section 8 HCV Program*

Section 8 of the United States Housing Act of 1937, as amended, authorizes the Secretary of the U.S. Department of Housing and Urban Development ("HUD") to enter into contracts with state and local public housing agencies ("PHAs") to provide financial assistance to low-income individuals or families renting housing on the private rental market. 42 U.S.C. § 1437f; *see* 42 U.S.C § 1437f(a) (noting that the Section 8 housing program was created "for the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing"); *see also* 24 C.F.R. § 982.1 (describing the Section 8 program generally); 24 C.F.R. § 982.4(b) (defining a PHA). Generally, two types of housing assistance are available to eligible individuals under Section 8: project-based and tenant-based. Project-based assistance refers to subsidies given directly to privately-owned developments. Tenant-based assistance refers to subsidies given to individual tenants, who use the funds to pay rent. These subsidies are tied to the individual tenant, and may be carried by a relocating tenant for use in a new home.

Local and state PHAs are responsible for the administration of the program. *See* 42 U.S.C. § 1437(a)(1)(C) (vesting these agencies with "the maximum amount of responsibility

---

[1] The facts are gathered from Augusta's complaint and filings as well as defendant's exhibits and publicly available materials such as the DHCR Administrative Plan. Throughout this opinion, "Ex." is used to refer to exhibits filed with defendant's motion for summary judgment.

and flexibility in program administration"). In New York, the Section 8 HCV program is administered by the New York State Division of Housing and Community Renewal ("DHCR"), which acts as the PHA for all local programs under its purview. DHCR contracts with local administrators ("LA") who are responsible for the local administration of the HCV program. CDCLI is the LA for Suffolk County and thus is responsible for implementing the HCV Program in accordance with all applicable federal, state and local fair housing laws and regulations. HUD promulgates regulations for the implementation of the Section 8 program at 24 C.F.R. § 982 *et. seq. See also* Ex. L, N.Y. DHCR, *Section 8 Administrative Plan* (Apr. 1, 2006) (operational handbook for implementing HCV program prepared in compliance with 24 C.F.R. § 982.54) ("DHCR Administrative Plan"); 24 C.F.R. § 982.4(b) (defining "administrative plan" as "[t]he plan that describes PHA policies for administration of the tenant-based programs").

Income eligible families (or individuals) seeking to participate in the HCV program file an application, and those who are determined to be preliminarily eligible are placed on a waiting list. When funding becomes available, the LA -- CDCLI in this case -- may issue a voucher to a family after eligibility has been determined and they have been briefed on program rights and obligations. Once issued a voucher, a family may begin searching for a unit.[2] A voucher is not a lease; rather, it is a commitment from the LA that it will pay the landlord of a suitable unit a housing subsidy on behalf of the participating family. The family is responsible for paying the difference between the rent charged and the amount subsidized by the program.[3]

---

[2] The relevant regulations define a voucher as "[a] document issued by a PHA to a family selected for admission to the voucher program. This document describes the program and the procedures for PHA approval of a unit selected by the family. The voucher also states obligations of the family under the program." 24 C.F.R. § 982.4(b).

[3] An "applicant" is a family that has applied for admission but is not yet a participant in the program. 24 C.F.R. § 982.4(b). A family is admitted to the program as a "participant" based on "the effective date of the first [Housing Assistance Payment] contract executed by the PHA for a family (first day of initial lease term)" in a tenant-based program. *Id.* In other words, merely holding a voucher does not make a family a "participant" in the program. Once a family is a participant, various federal laws and regulations apply, including regulations stating

A voucher has an expiration date, which may be extended to give a family additional time to locate housing. Neither the federal regulations nor the DHCR Administrative Plan require that a hearing be provided to a family when a request for an extension of a voucher is denied. 24 C.F.R. § 982.555(b)(4); DHCR Administrative Plan § 2.02.

B.      *Augusta's Voucher History*

Augusta was issued a voucher on April 23, 2003, by the New York City Department of Housing Preservation and Development. Augusta "ported," or transferred, his voucher to CDCLI in order to find housing in Suffolk County. Ex. F ("Augusta Dep.") 99-107. After requesting and being granted extensions, Augusta ultimately found an apartment operated by Mercy Haven, Inc. ("Mercy Haven"). Augusta Dep. 145. On September 9, 2003, Augusta's Housing Assistance Payment ("HAP") contract (between CDCLI and Mercy Haven) and lease agreement (between Augusta and Mercy Haven) for an apartment were executed.[4] Ex. K. Under the terms of the contract, Augusta's lease term began September 15, 2003 and ended August 31, 2004.[5]

In a letter dated May 20, 2004 to Mercy Haven, Augusta indicated that he had vacated his apartment as of May 17, 2004 and was terminating all contracts and leases for the apartment.[6] Ex. G (Bates stamp CDCLI-000078). On June 9, 2004, Bonnie Krinsky from Mercy

---

the obligations of a participant and the circumstances in which a PHA may terminate assistance to a participant. *Lowery v. District of Columbia Housing Authority*, No. Civ. A. 04-1868, 2006 WL 666840, at *1 (D.D.C. Mar. 14, 2006).

[4]     Typically, HUD distributes subsidies through a HAP contract, which sets forth the rights and duties of both the PHA and the private landlord. *See Carter v. Belmont Shelter Corp.*, No. 03-CV-62S, 2005 WL 578165, at *1, n.1 (W.D.N.Y. Mar. 9, 2005). The lease is a "written agreement between an owner and a tenant for the leasing of a dwelling unit to the tenant. [It] establishes the conditions for occupancy of the dwelling unit by a family with housing assistance payments under a HAP contract between the owner and the PHA." 24 C.F.R. § 982.4(b).

[5]     Under its terms, the HAP contract terminates automatically if the lease is terminated by the owner or the tenant. "If the family moves from the contract unit, the HAP contract terminates automatically." Ex. K.

[6]     Augusta vacated the premises as a result of eviction proceedings the landlord threatened to commence and Augusta wanted to avoid. At the time, Augusta was suffering from depression and substance abuse. Augusta Dep. 190-195.

4

Haven informed Darlene Hirst, a housing specialist at CDCLI, that Augusta no longer resided at the apartment. As result, CDCLI put Augusta's voucher in "pending status." Ex. G (Bates Stamp CDCLI-000080-81); Ex. M ("Mickens Aff.") ¶¶ 2, 4.

Augusta contacted CDCLI by telephone on or about July 7, 2004 and spoke with housing specialist Benita Mickens. Ex. E, p.4 (Def.'s Resp. Interrog. No. 1). Augusta told Mickens that he had vacated the apartment to enroll in a drug treatment and rehabilitation program, from which he anticipated being released within two weeks.[7] When Augusta inquired as to the status of his housing voucher, he was informed that it was in pending status and was subject to expiration but that he could renew it if he provided evidence of his continued sobriety and completion of the rehabilitation program at the time of his discharge. Mickens Aff. ¶ 5. Augusta agreed to provide the requested documentation. *Id.* He was also reminded that vacating the premises without notice to CDCLI was a program violation. *Id.* Nevertheless, Augusta's housing voucher remained in pending status, allowing him to maintain his voucher upon completion of his rehabilitation and treatment program. *Id.*

CDCLI received no further communication from Augusta until December 16, 2004, when he telephoned Mickens and informed her that he was in the Psychiatric Unit of the Southside Hospital. Mickens Aff. ¶ 8. Augusta again inquired about his voucher, asking whether it was possible for it to be re-issued. *Id.*; Ex. E, p.6 (Def.'s Resp. Interrog. No. 3). Mickens asserts that she told Augusta that because he had previously failed to provide documentation of rehabilitation and treatment, in order to receive additional consideration he

---

[7] According to CDCLI, the first time Augusta contacted it with respect to vacating the apartment was on July 7, 2004. Augusta alleges that he called CDCLI repeatedly during the months of May-July 2004. He further alleges that he notified CDCLI that he had vacated the apartment and repeatedly inquired as to the status of his voucher, which he understood to be "under investigation." *See* discussion *infra* C.2.

needed to contact her supervisor, Beverly Weinberg.[8] Mickens Aff. ¶ 8. She further asserts that Augusta must have contacted Weinberg and been granted an extension because his voucher was held in pending active status from July 2004 until May 2005, when the voucher and all extensions expired. *Id.* at ¶ 10. At oral argument Augusta said he never contacted Weinberg, but there is no dispute that the expiration of the voucher was in fact extended to May 2005.[9]

As of November 1, 2005, when Mickens conducted a routine review of Augusta's file, CDCLI had not received any documents regarding Augusta's rehabilitation. *Id.* at ¶ 11. Based on her review of his file, Mickens determined that Augusta's voucher had expired. *Id.* In a letter dated November 1, 2005 and mailed to Augusta's last known address, Mickens advised Augusta of his voucher's expiration and that he was no longer eligible for the rental assistance program. *Id.*; Ex. G (Bates stamp CDCLI-000075).

On November 15, 2005, Augusta telephoned CDCLI and inquired as to the status of his voucher. *Id.* at ¶ 12. Mickens informed him that it had expired and that he was no longer eligible for the program. *Id.* Augusta inquired as to the steps he could take to re-obtain his voucher, explaining that he suffered from drug abuse and depression. *Id.* Mickens advised him to send correspondence to CDCLI explaining his situation and to include any documents establishing completion of a rehabilitation program and his continued sobriety. *Id.* Mickens

---

[8] Mickens also states that she advised Augusta that if he required assistance in obtaining housing accommodations pending review of re-establishing his voucher, he could contact the Department of Social Services and Nassau Suffolk Law Services Supplemental Shelter Program. Mickens Aff. ¶ 9. However, Augusta states he was not in need of emergency housing at that time. Pl.'s Mot. Summ. J. ¶ X ("Upon discharge of South Side Hospital Plaintiff had permanent housing and was not in need of emergency housing as the Defendant would have you believe.").

[9] The Court ordered CDCLI to supply it with documentation at oral argument demonstrating that CDCLI extended Augusta's voucher until May 2005, as alleged in paragraph 10 of the Mickens Affidavit. In response, at oral argument counsel for CDCLI furnished the Court with a copy of CDCLI's Participant History Report, which showed that Augusta's voucher expired in May 2005. Although it would have been better if Augusta had been informed in writing of the expiration of his voucher at that time rather than in November 2005, as was the case, there is no dispute in the record that his voucher did not expire until May 2005.

6

explained that CDCLI would review those documents and determine whether his voucher could be reinstated. *Id.*; Ex. G (Bates stamp CDCLI-000074).[10]

In January 2006, John Francois of DHCR contacted CDCLI and requested Augusta's file. Ex. N ("Bruno Aff.") ¶ 6. DHCR was conducting a review of his voucher status pursuant to Augusta's request. *Id.*[11] CDCLI provided DHCR with its file. *Id.* In February 2006, DHCR directed CDCLI to reinstate Augusta's expired voucher. *Id.* at ¶ 7. In accordance with the customary CDCLI program requirements and administrative procedures to reinstate a voucher, arrangements were made for an in-person tenant conference with Augusta. Mickens Aff. ¶¶ 15-16. Augusta was also instructed to provide documentation of completion of a rehabilitation program as well as his financial status. *Id.* A tenant conference was scheduled with Augusta for May 3, 2006. *Id.*

Prior to the scheduled conference, Jennie Lu, a social worker with the Montrose Veterans Administration ("VA"), contacted CDCLI on Augusta's behalf. *Id.* at ¶ 17. Lu informed Mickens that Augusta could not attend the May 3, 2006 conference with CDCLI because he was scheduled to move to the Northpoint VA residence on May 11, 2006 for a 28-day substance abuse and treatment program, which would be followed by a four to five month domiciliary program. *Id.* Lu further explained that at the completion of the domiciliary program, Augusta would be referred to a VA program for transitional housing, and he could attempt to obtain housing under the Section 8 voucher program at that time. *Id.* As a result of this information, Augusta's voucher was held in abeyance pending his completion of these programs. *Id.*

---

[10] In addition to contacting Mickens, Augusta contacted Corrine Hammons, the Vice President of Rental Assistance at CDCLI, at some time during late 2005 to early 2006 to inquire about the status of his voucher. Ex. O ("Hammons Aff.") ¶ 5.
[11] The Bruno affidavit incorrectly states that DHCR contacted CDCLI "in or about January or February of 2007." Bruno Aff. ¶ 6. Based on other statements in the affidavit, the year was 2006. *Id.* at ¶ 7.

On January 11, 2007, Mickens received correspondence from a social worker at the Northpoint VA Medical Center. *Id*. at ¶ 18. It explained that Augusta had completed a five-month substance abuse and residential rehabilitation treatment program, was continuing in aftercare services and was residing in a halfway house. *Id*. Based on this information, Mickens scheduled a tenant conference with Augusta for January 26, 2007. *Id*.

On January 26, 2007, Mickens met with Augusta, providing him with the program information packet and assisting him with the completion of all necessary forms for the re-issuance of his voucher. *Id*. at ¶ 19. On February 5, 2007, CDCLI notified Augusta that he would be receiving his voucher and tenancy packet. *Id*. Augusta's voucher was re-issued on February 15, 2007. *Id*. Augusta subsequently obtained housing under this voucher. Augusta's voucher has been ported to another agency since re-issuance at his request. Hammons Aff. ¶ 8.

## DISCUSSION

A.  *The Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56(c), a moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994) ("[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists."). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In determining whether an issue is genuine, "[t]he

8

inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*) and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)). Therefore, although a court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223-24 (citations omitted).[12]

B.   *Procedural Due Process*

The Fourteenth Amendment forbids states from depriving any person of property without due process of law. *See* U.S. Const. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law. . . ."). Procedural due process refers to the minimal requirements of notice and a hearing guaranteed by the due process clause of the 5th and 14th Amendments when the deprivation of a significant life, liberty or property interest may occur. To prevail on a procedural due process claim, a plaintiff first must identify a property or liberty interest that is entitled to due process protection. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39 (1985); *see also Carter*, 2005 WL 578165 at *4.

---

[12] This standard applies equally to cases in which both parties have moved for summary judgment. "[W]hen parties have filed cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Bronx Household of Faith v. Board of Educ. of New York*, 492 F.3d 89, 96 (2d Cir. 2007) (internal quotation marks and citation omitted).

"[R]ecipients of public assistance, such as Section 8 assistance, have a protected property interest in continuing to receive such assistance." *Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. & Intergovernmental Affairs*, No. 07-CV-2243, 2007 WL 4591845, at *14 (E.D.N.Y. Dec. 26, 2007). To terminate this type of property interest, due process requires "(1) timely and adequate notice, including the reasons for the proposed termination, (2) an opportunity to be heard at a pre-termination hearing, including the right to present evidence and confront and cross-examine witnesses, (3) a right to be represented by counsel at the hearing, (4) a written decision, including the reasons for the determination and the evidence on which the decision maker relied, and (5) an impartial decision maker." *Id.* at *15 (citing *Goldberg v. Kelly*, 397 U.S. 254, 266-71 (1970)).

C.  *Augusta's Complaint*

1.  *Augusta's Claim That He Was Denied a Hearing*

Augusta alleges he was denied a hearing in January 2005 prior to the termination of his Section 8 benefits. Compl. ¶ 4. However, because Augusta's voucher expired on its own terms, and not as the result of any act of termination by CDCLI, Augusta was determined to be ineligible for benefits based on a ground that does not require a hearing.

HUD regulations mandate that PHAs "adopt a written administrative plan that establishes local policies for administration of the program in accordance with HUD requirements," and which "must be in accordance with HUD regulations and requirements." 24 C.F.R. § 982.54(a)-(b). In particular, HUD regulations require PHA administrative plans to include policies regarding "[i]ssuing or denying vouchers, including PHA policy governing the voucher term and any extensions or suspensions of the voucher term." 24 C.F.R. § 982.54(d)(2).

Under the HUD regulations, the initial term of a voucher is 60 days and must be stated on the voucher. 24 C.F.R. § 982.303(a). While extensions may be granted, under the PHA administrative plan applicable to Augusta, the initial term plus any extensions may not exceed 180 calendar days from the initial date of issuance. DHCR Administrative Plan § 2.01.[13] Requests for extensions or suspensions must be made in writing prior to the expiration date of the voucher.[14] *Id*. at § 2.04. In addition, the local administrator ("LA") -- in this case CDCLI -- must inform the program participant in writing when the voucher has expired, at which point the participant may reapply. *Id*. at § 2.02. "If a voucher has expired, has not been extended by the LA or expires after an extension, the family will be denied assistance. As allowed by program regulations, a decision by the LA *not* to extend a voucher is not subject to an informal hearing." *Id*. at § 2.02 (emphasis in original).

Augusta's voucher was extended in or around July 2004 after he vacated his Mercy Haven apartment and entered into a rehabilitation program. Regardless of whether or how (written or oral) he requested an extension, construing the facts in the light most favorable to Augusta, the latest date on which his voucher could have expired was 180 days later, on or about January 2005. Notwithstanding the DHCR Administration Plan's policy that the maximum term of a voucher is 180 days, Augusta's voucher was extended until May 2005, a total of 11 months. When Mickens reviewed Augusta's file on November 1, 2005, Augusta's voucher had long since expired. Accordingly, Mickens terminated his case. Based on these

---

[13] The regulations do not define the maximum term of a voucher. They do, however, permit the PHA "[a]t its discretion … [to] grant a family one or more extensions of the initial voucher term in accordance with PHA policy as described in the PHA administrative plan." 24 C.F.R. § 982.303(b)(1). In addition, with respect to individuals such as Augusta, who suffer from disabilities, the regulations state that "[i]f the family needs and requests an extension of the initial voucher term as a reasonable accommodation, in accordance with part 8 of this title, to make the program accessible to a family member who is a person with disabilities, the PHA must extend the voucher term up to the term reasonably required for that purpose." 24 C.F.R. § 982.303(b)(2).

[14] A "suspension" is defined as "[s]topping the clock on the term of a family's voucher, for such period as determined by the PHA, from the time when the family submits a request for PHA approval of the tenancy, until the time when the PHA approves or denies the request." 24 C.F.R. § 982.4(b).

facts, Augusta was terminated from the program on grounds which do not require a hearing under the regulations.[15]

In addition, Augusta's claim that he was denied a hearing fails because the circumstances that would afford him such a right -- the deprivation of a property interest -- are not present. To the extent he alleges a right to a hearing on the issue of whether his assistance was terminated because he was a drug abuser or dealer, Augusta has no such procedural due process right because he was not deprived of any property interest that would afford him that right. Augusta has offered no proof, nor is there any in the record before me, that he was terminated from the program until November 2005.[16] While CDCLI's rental assistance payments to Mercy Haven ceased after Augusta vacated his apartment, as allowed under the terms of program,[17] his access to assistance had not been terminated because his voucher had not expired. From the date he vacated his apartment until May 2005, approximately one year, Augusta's voucher remained unexpired. When Augusta was finally officially terminated from

---

[15] In order to comport with constitutional requirements of due process, the HUD regulations implementing the Section 8 program require each PHA to provide program participants the right to an informal hearing under a discrete set of circumstances, none of which are applicable here. 24 C.F.R. § 982.555(a)(1)(i)-(vi) (an informal hearing is required for determinations regarding (i) the family's income; (ii) the appropriate utility allowance; (iii) the family unit size; (iv) whether a program family is residing in a unit with a larger number of bedrooms than appropriate for the family unit size, or a PHA determination to deny the family's request for an exception from the standards; (v) terminating assistance for a participant family because of the family's action or failure to act; and (vi) terminating assistance because the participant family has been absent from the assisted unit for longer than the maximum period permitted under PHA policy and HUD rules). The regulations also make clear that, "[i]n the cases described in paragraphs (a)(1)(iv), (v) and (vi) of this section, the PHA must give the opportunity for an informal hearing *before* the PHA terminates housing assistance payments for the family under an outstanding HAP contract." 24 C.F.R. § 982.555(a)(2) (emphasis added).

The HCV program regulations also delineate eight circumstances when an informal hearing is not required. 24 C.F.R. § 982.555(b)(1)-(8) ((1) discretionary administrative determinations by the PHA; (2) general policy issues or class grievances; (3) establishment of the PHA schedule of utility allowances for families in the program; (4) a PHA determination not to approve an extension or suspension of a voucher term; (5) a PHA determination not to approve a unit or tenancy; (6) a PHA determination that an assisted unit is not in compliance with HQS; (7) a PHA determination that the unit is not in accordance with HQS because of the family size; and (8) a determination by the PHA to exercise or not to exercise any right or remedy against the owner under a HAP contract).

[16] Moreover, Augusta's voucher was reinstated in January 2006, albeit at the direction of DHCR, and he ultimately used it to obtain housing in early 2007.

[17] The regulations provide that one of the obligations of a program participant is to "notify the PHA and the owner before the family moves out of the unit, or terminates the lease on notice to the owner." 24 C.F.R. § 982.551(f); *see also* 24 C.F.R. § 982.314.

12

the Section 8 program in November 2005, it was as a result of his voucher's expiration, and was not due to any determination or decision to terminate on the part of CDCLI.

As discussed above, a PHA such as CDCLI may terminate assistance to a family upon expiration of a family's voucher. In such circumstances, a hearing is not required. Because there is no genuine issue of material fact with respect to Augusta's voucher expiring on its own terms, I conclude that he was not denied due process. Accordingly, defendant's motion for summary judgment is granted.

    2.    *Augusta's Allegation of Constructive Termination*

Augusta alleges in his motion for summary judgment that during the summer of 2004, having notified CDCLI that he was vacating the apartment,[18] he was informed by CDCLI that his voucher was being investigated based on allegations that he had been selling drugs out of the unit. Augusta alleges that CDCLI's housing specialist "deliberately mislead the plaintiff with deceitful information, therefore constructively terminating" his voucher. Pl.'s Aff. Supp. Mot. Summ. J. ("Augusta Aff.") ¶¶ 7, 18. In addition, he alleges that prior to July 7, 2004 he contacted CDCLI and was told by the housing specialist that his voucher was being investigated. *Id*. at ¶ 6. Augusta also alleges that in May-July 2004 he repeatedly inquired about the status of his voucher while he was completing a rehabilitation program, and was consistently told that his voucher was "under investigation." *Id*. at ¶¶ 2, 7. Augusta alleges that Mickens "misinformed" him of an investigation regarding his voucher and "willfully kept [him] in the dark as to who was investigating" his housing voucher. Pl.'s Mot. Summ. J. ¶ VI. He argues that this amounted to "constructive termination" since he believed he could not use the voucher while it was being investigated. Augusta Aff. ¶ 7.

---

[18] CDCLI claims that they first learned Augusta had vacated the apartment from Kritsky at Mercy Haven in June 2004.

13

It is not necessary to determine the precise contours of the discussions between Augusta and the CDCLI housing specialist regarding whether an investigation of his voucher took place, or whether he would have been entitled to a hearing even if such an investigation did occur, because these are not issues of material fact. Regardless of whether Augusta's voucher was "investigated," CDCLI ultimately terminated Augusta's case on legitimate grounds that do not require a hearing, *i.e.*, the expiration of the voucher by its own terms. Augusta's allegations do not refute CDCLI's records regarding what it relied on in terminating Augusta's case and thus concern non-material facts.

Having reviewed voluminous shelter and medical records supplied by Augusta to the Court,[19] in conjunction with his responses to interrogatories and deposition questions, it appears that from May 17, 2004, when he vacated his apartment at Mercy Haven, until December 2004, when he checked himself into a psychiatric unit of Southside Hospital, Augusta was suffering from severe depression and substance abuse. His records indicate that during this time he admitted himself on at least six occasions to drug detox and rehabilitation treatment centers and hospitals. Though he has since turned himself around commendably, the records and Augusta's testimony raise a strong likelihood that the disagreement over what was said about his voucher may be attributable to his precarious mental health condition at that time. In any event, even viewing the facts as alleged in the light most favorable to Augusta, I conclude, for the reasons set forth above, that defendant is entitled to summary judgment.

---

[19] Augusta provided the Court with over 500 pages of medical and shelter records at oral argument. At that time, defense counsel was given the opportunity to review the documents and did not object to them being submitted to the Court. Due to the sensitive nature of these documents, which include Augusta's detailed medical history as well as personal information about him and his family members, these documents will be filed under seal.

CONCLUSION

The defendant's motion for summary judgment is granted. Plaintiff's motion is denied. The Clerk is respectfully directed to close the case.

So ordered.


John Gleeson, U.S.D.J.

Dated:	Brooklyn, New York
	December 23, 2008